UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

STEPHEN M. CARPINIELLO, WILLIAM C.
DUFFELMEYER, MICHAEL WALTHER, PAUL
SPICONARDI, ARTHUR MARINELLI, STEVEN
HEISLER, SCOTT FORREST, and JEFF NARDI,

                      Plaintiffs,

               - against -

DAVID HALL, individually, ANTHONY
MARRACCINI, individually, and the
TOWN/VILLAGE OF HARRISON, New York,

                      Defendants.

**ECF CASE**

07 Civ. 1956 (PGG)

<u>**OPINION AND ORDER**</u>

PAUL G. GARDEPHE, U.S.D.J.:

          The Complaint in this action alleges claims under (1) 42 U.S.C. § 1983 for

violations of the Plaintiffs' First, Fourth and Fourteenth Amendment rights; and (2) 18 U.S.C.

§ 2520 for interception of wire, oral or electronic communications in violation of Title III.

Defendants have moved for summary judgment pursuant to Fed. R. Civ. P. 56.  For the reasons

set forth below, Defendants' motion for summary judgment is GRANTED.

## <u>BACKGROUND</u>

          Plaintiffs were Harrison, New York police officers when the incidents giving rise

to this action occurred.  Defendant Hall was the Chief of Police, and Defendant Marraccini was a

captain in the Police Department.  (Def. Rule 56.1 Stmt. ¶¶ 2, 130)[1]  The claims set forth in the

---

[1] Unless otherwise noted, citations to the parties' Rule 56.1 statements concern factual assertions
that are admitted or are deemed admitted because they were neither admitted nor denied by the
opposing party or have not been contradicted by citations to admissible evidence.  <u>See</u> <u>Giannullo
v. City of New York</u>, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . .  fails to
controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed
admitted.") (citations omitted).

Complaint stem from the Defendants' installation of a video camera in the Police Department's men's locker room.

The Police Department's men's locker room contains seventy-two individually assigned lockers.  (Id. ¶¶ 6, 10)  The door to the locker room has a combination lock.  (Id. ¶ 16)  The lock's combination is commonly known, however, and may be provided to any Department employee.  (Id.)  In addition to police officers, civilian employees of the Department, custodians, other town employees, and a laundry worker commonly enter the locker room.  These individuals either know the lock's combination or are admitted by a Department employee.  (Id. ¶¶ 12, 14-15)  The Chief of Police's female administrative assistant also enters the locker room in performing her duties.[2]  (Id. ¶ 13)

The locker room contains mailboxes for each of the officers, several bulletin boards containing Police Department notices, an exercise area, a shower area, and a bathroom.  (Id. ¶¶ 17-18, 24)  A door separates the shower area and the bathroom from the main locker room area.  (Id. ¶¶ 24-25)

In the spring of 2005, Captain Marraccini decided that a video camera should be installed in the locker room.[3]  (Id. ¶ 27)  After obtaining Chief Hall's approval (id. ¶ 29; Pltf. Rule 56.1 Stmt. ¶ 209), Marraccini asked Sergeant Dominick Pascale, the officer in charge of the Police Department's telecommunications and computer systems, to arrange for installation of a camera. (Def. Rule 56.1 Stmt. ¶¶ 30-31)  Pascale contacted Andrew Natarelli – who had

---

[2]  Plaintiffs have offered evidence that the administrative assistant knocks before entering the locker room and awaits permission to enter if there are men inside.  She has, at times, asked officers to escort her into the locker room or to enter the locker room for her.  (Pltf. Rule 56.1 Stmt. ¶ 13)

[3]  Defendants contend that Marraccini wanted a camera installed because of vandalism in the locker room, including damage to his locker.  (Def. Rule 56.1 Stmt. ¶¶ 2-5)  Plaintiffs claim that Marraccini rarely used his locker and that it was a hand-me-down in poor condition when installed.  (Pltf. Rule 56.1 Stmt. ¶¶ 220-35)

previously installed and maintained telecommunications systems and equipment for the Police

Department – about installing the camera (id. ¶¶ 32–34), and in April 2005, Natarelli and Pascale

installed a video camera in the ceiling of the locker room.[4]  (Id. ¶ 35–36.)

Defendants have offered evidence that the camera had video but not audio

capability (id. ¶¶ 38-39), and it appears to be undisputed that the camera lacked the equipment

necessary for audio recording.  (Def. Rule 56.1 Stmt. ¶ 43; Pltf. Rule 56.1 Stmt. ¶ 250)

The camera was designed to work with DigiVue computer software that had been

installed on Marraccini's computer.  (Def. Rule 56.1 Stmt. ¶¶ 45, 48)  Recording was to be

triggered by a sensor designed to detect movement within the camera's field of vision.  (Id. ¶ 53)

The motion sensor never worked as designed, however.  (Id. ¶ 55)  Pascale and Natarelli

attempted to procure upgraded software that would have enable the camera to function with a

motion sensor as intended, but they were unsuccessful, and the upgraded software was never

installed.  (Id. ¶¶ 57–59)

On May 4, 2005, Pascale and Natarelli captured two still images from the camera

using the DigiVue software.  (Id. ¶ 69)  No one is visible in either picture.  (Id. ¶ 70)  Defendants

have offered evidence that these are the only images captured by the camera. (Id.)  Pascale,

Natarelli, Marraccini, and Hall all swear in their affidavits that they have never seen or heard any

audio or video recordings of anyone in the locker room, and Marraccini, Hall, and Pascale affirm

that they never observed anyone in the locker room on camera.  (Id. ¶¶ 71–77)  Plaintiffs point

out, however, that the camera worked on at least one other occasion, because Natarelli states in

---

[4]  Defendants have offered evidence that the camera was intended to focus only on Marraccini's
locker.  (Def. Rule 56.1 Stmt. ¶¶ 64-65).  The camera's field of vision when installed, however,
included both Marraccini's locker and a neighboring locker.  Pascale and Natarelli attempted to
correct the placement of the camera but were never successful in limiting the camera's field of
vision to Marraccini's locker.  (Id. ¶¶ 66-68)  Plaintiffs have offered evidence that the camera's
field of vision included most of the lockers in that aisle.  (Pltf. Rule 56.1 Stmt. ¶¶ 66-67, 210)

his affidavit that he observed Pascale walking in front of the camera as part of a test.  (Pltf. Rule 56.1 Stmt. ¶ 242)

In mid to late 2005, Marraccini instructed Pascale to remove the camera from the locker room and to uninstall the DigiVue software from Marraccini's computer. (Def. Rule 56.1 Stmt. ¶ 79.)  The software was uninstalled from Marraccini's computer, but the two still images captured in May 2005 were not deleted. (Id. ¶¶ 80, 82)  Moreover, the camera remained in the locker room for several additional months.  (Id. ¶ 88)

On December 24, 2005, Officer Michael Marinelli and Officer Jeff Nardi, a plaintiff in this action, observed the camera in a ceiling vent in the locker room.  (Pltf. Rule 56.1 Stmt. ¶ 201)  The following day, another officer observed the camera protruding from the vent. (Id. ¶ 206)  When the existence of the camera was brought to his attention, Chief Hall disconnected it. (Id. ¶ 208.)

The installation and potential use of the camera was discussed during at least one PBA meeting, and PBA President Ralph Tancredi and PBA counsel Richard Bunyan raised the issue with Hall and Marraccini.  (Def. Rule 56.1 Stmt. ¶¶ 92, 95-97, 100)  During a December 2005 meeting, Tancredi and Bunyan told Hall that they intended to report the installation of the camera to an outside law enforcement agency.  (Id. ¶ 101)  PBA members Duffelmeyer and Walther also expressed objections to the installation of the video camera in the locker room. (Pltf. Rule 56.1 Stmt. ¶¶ 276, 283)

Plaintiffs (other than Forrest and Nardi) allege that they were retaliated against because of statements they made concerning the video camera.  For example, in March 2006,

Carpiniello was transferred from the Training Division to the Patrol Division[5] (Def. Rule 56.1 Stmt. ¶ 122), while in June 2006 and December 2007, Duffelmeyer was passed over for promotion.[6] (Pltf. Rule 56.1 Stmt. ¶¶ 277-78)  Plaintiffs have presented evidence that Walther lost overtime pay as part of a court security detail and received less desirable work assignments.[7] (Id. ¶¶ 284-291)  Plaintiffs also contend that Spiconardi was accused of misconduct by Hall and Marraccini[8] (id. ¶¶ 170-72), and that Marraccini threatened Marinelli with criminal charges.[9] (Id. ¶¶ 173-74)  Finally, Plaintiffs present evidence that Heisler was denied a transfer to a more desirable unit.[10]  (Id. ¶ 178-79)

Plaintiffs filed this action on March 7, 2007.  They assert claims under 42 U.S.C. § 1983 for violations of their Fourteenth Amendment right to privacy (Compl. ¶¶ 42-43), retaliatory conduct in violation of the First Amendment (Compl. ¶¶ 44-45), and violations of the Fourth Amendment (Compl. ¶¶ 48-49).  Plaintiffs also bring a claim for violations of the Omnibus Crime Control and Safe Streets Act.  (Compl. ¶¶ 46-47)

This action was referred to Judge Conner[11] as related to a previously filed case, DeVittorio v. Hall (07 Civ. 812).  DeVittorio was filed on behalf of Harrison Police Officers Peter T. DeVittorio, Ralph Tancredi, Michael Marinelli and Edward Arce.  DeVittorio v. Hall, 589 F. Supp. 2d 247 (S.D.N.Y. 2008).  That suit named Chief Hall, Captain Marraccini, and the

---

[5]  The parties dispute whether this transfer placed Carpiniello in a position more appropriate to his rank and whether his new position afforded him the same opportunities for earning overtime pay as his previous position.  (Pltf. Rule 56.1 Stmt.  ¶¶ 123-25)

[6]  The parties dispute whether Duffelmeyer had been previously assured by Chief Hall that he would be promoted and whether Duffelmeyer was as qualified as the officers who were promoted.  (Pltf. Rule 56. 1 Stmt. ¶¶ 134-52, 273-74)

[7]  Defendants offer evidence disputing these facts.  (Def. Rule 56.1 Stmt. ¶¶ 158-59, 284-91)

[8]  Defendants offer evidence disputing these facts.  (Def. Rule 56.1 Stmt. ¶¶ 170-72)

[9]  Defendants offer evidence disputing these facts.  (Def. Rule 56.1 Stmt. ¶¶ 173-74)

[10]  Defendants deny that Heisler ever applied for the transfer and offer evidence that he was not qualified for such a transfer.  (Def. Rule 56.1 Stmt. ¶¶ 178, 185)

[11]  This case was reassigned to this Court on July 22, 2009, following Judge Conner's death.

Town/Village of Harrison as defendants and was filed by the same law firm that represents the

Plaintiffs here.  Id.  The facts of the two cases are essentially identical, and the Plaintiffs in

DeVittorio asserted the same claims made here.  Compare Compl. ¶¶ 14-49; DeVittorio, 589 F.

Supp. 2d at 249-253.  The two cases were never formally consolidated, however.

When Defendants moved for summary judgment before Judge Conner, they

captioned their motion papers as if the motion applied to both cases.  DeVittorio, 589 F. Supp. 2d

at 249 n.1.  The parties' briefing dealt only with DeVittorio, however, and accordingly, Judge

Conner's opinion granting summary judgment to the Defendants on all claims addressed only

DeVittorio.  Id.  Judge Conner's opinion was affirmed by the Second Circuit in a summary

order.[12]  DeVittorio v. Hall, No. 08-5990-cv, 2009 WL 3109865 (2d Cir. Sept. 30, 2009).

On June 30, 2009, Defendants moved for summary judgment in this action.  (Dkt.

No. 29)

## DISCUSSION

Summary judgment is warranted where the moving party shows that "there is no

genuine issue as to any material fact" and that it "is entitled to a judgment as a matter of law."

Fed. R. Civ. P. 56(c).  "The movant's burden will be satisfied if he can point to an absence of

---

[12]  Defendants argue that the doctrines of res judicata and collateral estoppel bar Plaintiffs from
re-litigating the issues decided in DeVittorio.  (Def. Br. 3-5)  That issue – which this Court does
not reach – turns on whether Plaintiffs are in privity with the plaintiffs in DeVittorio.  See Ferris
v. Cuevas, 118 F.3d 122, 126 (2d Cir. 1997).  Given that this action and DeVittorio present the
same claims and the same facts, that the plaintiffs in DeVittorio had the same incentive to pursue
their case as the plaintiffs here, and that the plaintiffs in both cases were represented by the same
law firm, Defendants have a strong argument that res judicata applies.  See Chase Manhattan
Bank, N.A. v. Celotex Corp., 56 F.3d 343, 346 (2d Cir. 1995) ("Res judicata may bar non-parties
to earlier litigation not only when there was a formal arrangement for representation in, or actual
control of, the earlier action but also when the interests involved in the prior litigation are
virtually identical to those in later litigation."); Conte v. Justice, 996 F.2d 1398, 1402 (2d Cir.
1993) ("[T]he appearance of the same attorney in both actions creates the impression that the
interests represented are identical.").  This Court need not decide the issue, however, because
Defendants are entitled to judgment as a matter of law on the merits of this case.

evidence to support an essential element of the nonmoving party's claim." Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995)

"A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008).  In deciding a summary judgment motion, the Court "resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." Cifra v. General Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001).  However, "a party may not 'rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.'" Lipton v. Nature Co., 71 F.3d 464, 469 (2d Cir. 1995) (quoting Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986).

## I.    PLAINTIFFS' FOURTH AND FOURTEENTH AMENDMENT CLAIMS WILL BE DISMISSED

Plaintiffs' Fourth Amendment and Fourteenth Amendment claims are predicated on the contention that their privacy was violated when their activities in the Police Department locker room were recorded.

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. amend. IV.  For Fourth Amendment purposes, "[a] 'search' occurs 'when an expectation of privacy that society is prepared to consider reasonable is infringed.'" United States v. Karo, 468 U.S. 705, 712 (1984) (quoting United States v. Jacobsen, 466 U.S. 109, 113 (1984)).  In order for the Fourth Amendment to be violated, a search must have actually taken place.  In Karo, for example, the Supreme Court held that the "mere transfer to Karo of a can containing an unmonitored beeper infringed no privacy interest."  The unmonitored beeper

"created a potential for an invasion of privacy, but we have never held that potential, as opposed to actual, invasions of privacy constitute searches for purposes of the Fourth Amendment."  468 U.S. at 72 (emphasis in the original).

Here, the installation of the video camera in the locker room of the Harrison Police Department "created a potential for an invasion of privacy," but Plaintiffs have failed to present a material issue of fact as to whether such an invasion actually occurred.  Defendants have offered evidence demonstrating that the still pictures of an empty locker room captured on May 4, 2005, are the only images ever captured by the camera.  (Def. Rule 56.1 Stmt. ¶¶ 69-70) Pascale, Natarelli, Marraccini, and Hall have all given sworn statements that they have never seen or heard about any audio or video recordings made or being made with the camera.  (Def. Rule 56.1 Stmt. ¶¶ 71-77)  Moreover, it is undisputed that the camera never worked as intended, with recording triggered by a motion sensor.  (Pltf. Rule 56.1 Stmt. ¶ 57)

Plaintiffs contend, however, that "the camera was working and streaming video, which was observable on a computer screen. . . ."  (Pltf. Rule 56.1 Stmt. ¶ 242)  Plaintiffs offer two pieces of evidence in support of this allegation:  (1) Natarelli's observation of Pascale walking in front of the camera when the two men were testing whether the camera was operational (Pltf. Rule 56.1 Stmt. ¶ 242; Natarelli Aff. ¶ 15), and (2) the two still pictures produced by the camera.  (Pltf. Rule 56.1 Stmt. ¶¶ 247-48; Dugan Decl. ¶¶ 3-5).  At best, this is evidence that the camera may, on occasion, have worked, albeit not as intended.  Plaintiffs have not produced any evidence that a recording of any kind was ever made in which one of them appeared, nor have they produced any evidence that anyone using the camera ever observed their activities in the locker room.

Similarly, no genuine issue of material fact exists as to whether Plaintiffs were ever subjected to audio recording.  Plaintiffs concede that the camera was not capable of recording audio when it was originally purchased by Natarelli.  They likewise concede that the camera does not contain a microphone, which would be required for recording audio.  (Pltf. Rule 56.1 Stmt. ¶¶ 40, 43, 249)  The only support for Plaintiffs' assertion that audio may have been recorded in the locker room is that the video cable on the camera was spliced such that it could be connected to another cable.  (Id. ¶¶ 252-53, Ex. 17)  Joseph Hayes, a security specialist who examined the camera, acknowledges in his affidavit that the video wire is spliced, but goes on to state that the camera would need "a third cable capable of transmitting an audio signal" in order to record audio.  (Hayes Aff. ¶¶ 8-9)  This echoes Natarelli's statement that a third cable would be required.  (Natarelli Aff. ¶ 6)  Plaintiffs have presented no evidence that an audio cable was ever attached to the camera or that a microphone was ever installed.  In sum, there is simply no evidence that Plaintiffs' conversations in the locker room were ever intercepted.

After considering the evidence in the light most favorable to Plaintiffs, it is clear that the Plaintiffs have offered, at most, the "potential for an invasion of privacy" but have offered no evidence of an actual invasion of privacy.  See Karo, 468 U.S. at 712; see also DeVittorio, 589 F. Supp. 2d at 257, aff'd, 2009 WL 3109865, at * 1 (2d Cir. Sept. 30, 2009).  Accordingly, Defendants are entitled to summary judgment on Plaintiffs' Fourth Amendment and Fourteenth Amendment claims.

## II.   PLAINTIFFS' CLAIMS UNDER THE OMNIBUS CRIME CONTROL AND SAFE STREETS ACT WILL BE DISMISSED

Title 18, U.S.C. § 2520 provides a private right of action to "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of" the provisions of Title III.  18 U.S.C. § 2520(a).  The language of the statute

indicates that an actual interception must have taken place before a claim under the statute may be brought.  Id.  Indeed, courts have granted summary judgment where there is no evidence that a plaintiff's communications were ever intercepted.  DeVittorio, 589 F. Supp. 2d at 258, aff'd, 2009 WL 3109865, at *2; Gross v. Taylor, No. Civ.A. 96-6514 (ENC), 1997 WL 535872, at *4-6 (E.D.Pa. Aug. 5, 1997) ("Without evidence of actual recording, Plaintiffs cannot withstand summary judgment."); see also DIRECTV Inc. v. Minor, 420 F.3d 546, 549 (5th Cir. 2005) (stating that "actual interception" is a "key element" of a Title III claim and holding that "where circumstantial evidence of interception is confined largely to demonstrating the purchase and possession of the devices at issue, rather than the use of those devices to intercept[] transmissions, summary judgment may be proper").

Even if Plaintiffs had offered evidence that the camera was capable of recording audio – which they have not done – there is no evidence that any of Plaintiffs' communications were ever actually intercepted.  Accordingly, Defendants are entitled to summary judgment on Plaintiffs' claim for relief under 18 U.S.C. § 2520.

III.    **PLAINTIFFS' FIRST AMENDMENT CLAIMS WILL BE DISMISSED**

"To survive a motion for summary judgment on a First Amendment retaliation claim, the plaintiff must present evidence which shows (1) that the speech at issue was protected, (2) that he suffered an adverse employment action, and (3) that there was a causal connection between the protected speech and the adverse employment action."  Cotarelo v. Vill. of Sleepy Hollow Police Dep't, 460 F.3d 247, 251 (2d Cir. 2006).

Whether the speech of a public employee is protected from retaliation under the First Amendment depends on "(1) 'whether the employee spoke as a citizen on a matter of public concern' and, if so, 'whether the relevant government entity had an adequate justification for

10

treating the employee differently from any other member of the general public.'"  Ruotolo v. City of New York, 514 F.3d 184, 188 (2d Cir. 2008) (quoting Garcetti v. Ceballos, 547 U.S. 410, 418 (2006)).  "'Whether an employee's speech addresses a matter of public concern is a question of law for the court to decide, taking into account the content, form, and context of a given statement as revealed by the whole record.'"  Ruotolo, 514 F.3d at 189 (quoting Lewis v. Cowen, 165 F.3d 154, 163 (2d Cir. 1999)).

A matter of public concern is "one that 'relat[es] to any matter of political, social, or other concern to the community.'"  Sousa v. Roque, 578 F.3d 164, 170 (2d Cir. 2009) (quoting Connick v. Myers, 461 U.S. 138, 146 (1983)).  "The heart of the matter is whether the employee's speech was 'calculated to redress personal grievances or whether it had a broader public purpose.'"  Ruotolo, 514 F.3d at 189 (quoting Lewis, 165 F.3d at 163-64).  "'Speech on a purely private matter, such as an employee's dissatisfaction with the conditions of his employment, does not pertain to a matter of public concern.'"  Sousa, 578 F.3d at 174 (quoting Lewis, 165 F.3d at 164).  "An employee who complains solely about his own dissatisfaction with the conditions of his own employment is speaking 'upon matters only of personal interest.'"  Sousa, 578 F.3d at 174 (quoting Connick, 461 U.S. at 147).  Although motive is relevant to the inquiry, it is not dispositive.  Sousa, 578 F.3d at 174 ("We make clear today, however, that it does not follow that a person motivated by a personal grievance cannot be speaking on a matter of public concern.")

The speech at issue here does not pertain to matters of public concern.  In objecting to the installation of the video camera in the Police Department locker room, see, e.g., Heisler Aff. ¶ 11; Marinelli Aff. ¶ 12; Walther Aff. ¶ 14, Plaintiffs were complaining about their

"own dissatisfaction with the conditions of [their] employment."  See Sousa, 578 F.3d at 174; see also DeVittorio, 589 F. Supp. 2d at 259-60.

Plaintiffs argue that their speech addresses matters of public concern because it involves the actions of public officials – Hall and Marraccini – who are charged with upholding the law.  (Pltf. Br. 19-20)  Plaintiffs also note that some of their statements alluded to reporting the video camera installation to an outside law enforcement agency.  (Carpiniello Aff. ¶ 17; Walther Aff. ¶ 14; Marinelli Aff. ¶ 11)  However, "a public employee may not transform a personal grievance into a matter of public concern by invoking a supposed popular interest in the way public institutions are run."  Ruotolo, 514 F.3d at 190 (citations omitted).  None of the cases cited by Plaintiffs are to the contrary; each case involves speech that addressed a wrong on the public at large.  See Rookard v. Health & Hospitals Corp., 710 F.2d 41, 46 (2d Cir. 1983) (finding that an employee's complaint to the Inspector General of a public hospital about "corrupt and wasteful practices" involved a matter of public concern); Rao v. New York City Health & Hosps. Corp., 905 F. Supp. 1236, 1243 (S.D.N.Y. 1995) (finding that speech intended "to make [the employee's] superiors aware of problems in the management of a major city project and of perceived extortion attempts" involved matters of public concern).

Here, Plaintiffs were objecting to the installation of a video camera that affected only employees of the Harrison Police Department.  The installation of the camera had no effect on the broader public and did not present a matter of public interest or debate.  Because Plaintiffs' speech did not address a matter of public concern, see Ruotolo, 514 F.3d at 190; DeVittorio, 589 F. Supp. 2d at 259-60, Plaintiffs' First Amendment claim must be dismissed. See Cotarelo, 460 F.3d at 251.

## CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment is

GRANTED. The Clerk of the Court is directed to terminate the motion (Docket No. 29) and to

close this case.

Dated: New York, New York
       March 16, 2010

                              SO ORDERED.

                              Paul G. Gardephe
                              United States District Judge

13